# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | | |
|---|---|---|
| **ALBERT OTERO** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL NO. _____** |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **LIFESTYLE ASSET MANAGEMENT,** | § | |
| **LLC, and LIGITA GIDOOMAL** | § | |
| **REVOCABLE TRUST,** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiff Albert Otero ("Plaintiff" or "Mr. Otero") files this Original Complaint against Defendants Lifestyle Asset Management, LLC ("Manager") and Ligita Gidoomal Revocable Trust ("Gidoomal") (collectively, "Defendants"), and in support thereof show the following:

## INTRODUCTION

1.      About a year ago, Mr. Otero agreed to purchase ten equity units in Lifestyle Kauai, LLC ("Company"), which owns a luxury investment property managed by the Manager. Mr. Otero received full ownership of five units upon closing and his payment of over a half-million dollars. The other five units were held by the "seller" of these units, Defendant Gidoomal, as collateral pending Mr. Otero's final payment of $480,000 in late December 2020. Mr. Otero's final payment, however, is subject to the terms and conditions in his agreements with the Manager, including the condition that the Manager transfer the units owed to Mr. Otero "free and clear of all liens and encumbrances of any kind."

2.     After closing on his agreement with the Manager, Mr. Otero discovered that the Manager has failed to pay hundreds of thousands of dollars in past expenses, liens, and taxes owed by the Company in violation of the Company's governing documents. He also discovered that the Manager has failed or refused to collect any shared expenses owed under the Company's Operating Agreement from most of the Company's other equity owners, including Defendant Gidoomal who has never paid any shared expenses on the five units held in collateral for Mr. Otero. Mr. Otero raised these failures with the Manager and demanded that the Manager cure them, but the Manager has refused, telling Mr. Otero, "[a]s for paying the balances due…, that is not going to happen… before you fund the $480,000."

3.     Accordingly, Mr. Otero is left with no choice but to bring this action against Defendants seeking to enforce and uphold their obligations to Mr. Otero under the controlling agreements and Colorado law.

## PARTIES

4.     Plaintiff Albert Otero is a natural person and resident of California.

5.     Defendant Lifestyle Asset Management, LLC is a Colorado limited liability company and its principal place of business is 155 E. Boardwalk Dr., Suite 473, Fort Collins, Colorado 80525. On information and belief, its members are all residents of Colorado and/or states other than California, where Mr. Otero resides. It may be served through its registered agent, Lifestyle Asset Group, LLC, at 155 E. Boardwalk Dr., Suite 473, Fort Collins, Colorado 80525.

6.     Defendant Ligita Gidoomal Revocable Trust is a Florida-based entity that may be served at 6000 Island Blvd., Unit #2302, Aventura, Florida 33160. On information and belief, it

may also be served via its agent, Ligita Gidoomal, a Florida resident, at said address or wherever she may be found.

## JURISDICTION & VENUE

7.     The Court has diversity jurisdiction over this matter pursuant 28 U.S.C § 1332, because Plaintiff and Defendants are citizens of different States and the amount in controversy in this action exceeds $75,000.

8.     The Court also has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiff's declaratory judgment claim arises under federal law.

9.     To the extent the Court does not have subject matter jurisdiction over one or more of Plaintiff's claims, the Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. §§ 1367(a) and/or (b).

10.     The Court has personal jurisdiction over the Manager because Manager is a resident or citizen of Colorado. The Court also has personal jurisdiction over Manager because Plaintiff's claims arise out of or relate to Manager's minimum contacts with this forum.  In addition, Manager consented to jurisdiction in this forum pursuant to the forum selection clause in the Operating Agreement that Plaintiff's claims arise out of and/or relate to.

11.     The Court has personal jurisdiction over Gidoomal because Plaintiff's claims arise out of or relate to Gidoomal's minimum contacts with this forum and exercising jurisdiction over Gidoomal would not offend traditional notions of fair play and substantial justice. Gidoomal's minimum contacts with this forum include without limitation investing in a Colorado limited liability company, agreeing to become a member of a Colorado limited liability company pursuant to the Operating Agreement, and Gidoomal's contacts with the Manager, which is a Colorado-

based company whose representatives are residents of Colorado. In addition, Gidoomal consented to jurisdiction in this forum pursuant to the forum selection clause in the Operating Agreement that Plaintiff's claims arise out of and/or relate to.

12.     Venue is proper in this forum, because Defendants expressly agreed in the Operating Agreement that suit may be brought in this venue. Venue is also proper, because a substantial part of the events giving rise to Plaintiff's claims occurred in this venue.

## **FACTS**

**A.     The Company Owns a Luxury Property, Managed by the Defendant-Manager, for the Use and Enjoyment of Its Equity Owner Members.**

13.     The Company is a manager-managed limited liability company, meaning it is managed by a single managing member, and its other members (the "Equity Owner Members") are investors who have no management powers or responsibilities.

14.     Defendant Lifestyle Asset Group, LLC (the Manager) is the managing member of the Company and has been since the Company's inception in 2018.

15.     In October 2018, the Company acquired a luxury residence at Timbers Hokuala Kauai Laola #1004, Kauai, Hawaii ("the Property") for the use and benefit of the Equity Owner Members. Similar to a time share, each Equity Owner Member is allocated a certain number of weeks during the year to enjoy exclusive use of the Property. The more equity an Equity Owner Member acquires in the Company, the more weeks that Member is allocated to use the Property during the year.

16.     Unlike a time share, however, the Equity Owner Members' substantial investment in the Company affords them certain rights and interests in the Property. The Equity Owner Members' rights under these governing documents include, among others, a share of any profits

generated from the Manager's rental of the Property to third parties, a share of the proceeds from the sale of the Property, and usage and reservation rights.

17.     To become a member of the Company, each Equity Owner Member must execute the Subscription Agreement provided with the Company's Offering Documents and make an initial capital contribution. Each Equity Owner Member must also agree to the terms of the Operating Agreement and/or is bound by the terms of the Operating Agreement upon becoming an Equity Owner Member.

18.     A true and correct copy of the Company's Operating Agreement is attached hereto as <u>Exhibit A</u> and incorporated herein by reference. A true and correct copy the Company's Management Authority and Reservation Policies and Procedures ("<u>Management Authority</u>") that was included in the Offering Documents provided by the Manager to Mr. Otero is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

19.     The Operating Agreement imposes certain obligations on the Equity Owner Members to ensure they proportionately contribute to the success of the Property, including: each "Equity Owner Member shall pay the Company Quarterly Shared Expenses equal to $1,093.75, for an aggregate fee of $4,375 per year for one (1) equity unit." Operating Agreement ¶ 5.03(a).

20.     The Operating Agreement generally "may be amended or modified from time to time *only by a written instrument* adopted by the Manager or Managers and *executed and agreed to by a Super Majority Vote*" of the Equity Owner Members. *Id.* art. 9 (emphasis added). The Operating Agreement "contains the entire agreement and understanding between the Manager and the Members." *Id.* ¶ 12.01. It also "supersedes all prior oral and written understandings and agreements between them concerning the Company and the Company property." *Id.* The Operating

Agreement further makes clear that "[t]here are no representations, agreements, arrangements or understandings, oral or written, between or among the parties [t]hereto relating to the subject matter of th[e] Agreement which are not fully expressed" in the Operating Agreement. *Id.*

21.     The Property is located at a private resort and residence club that is managed by a company known as Timbers Resorts ("Timbers"). Timbers generally rents the Property and other residences at the resort to third parties, provides and manages shared amenities at the resort, and issues bills to the Company for ongoing expenses at the Property. Ultimately, however, Timbers is not responsible for managing the Property.

22.     Rather, the Equity Owner Members entrust the Manager with "the exclusive right to manage the Company's business." Operating Agreement ¶ 6.01.

23.     In carrying outs its powers, the Manager owes various fiduciary duties to the Equity Owner Members under Colorado law, including without limitation the duty to account, the duty to provide timely and accurate information, the duty of care, the duties to act competently and diligently in relation to the Company's business, the duty of loyalty, and the duty to refrain from competing with the Company. *See, e.g.*, C.R.S. §§ 7-80-404 to -408.

24.     The Company's governing documents also require the Manager to effectively manage and prevent waste to the Property in a number of ways, including without limitation:

   a.   The Manager is required to bill the Equity Owner Members for their respective Shared Expenses and shall "make every effort to collect the same promptly in accordance with the Operating Agreement." Management Authority ¶ 11.1

   b.   The Manager must not "encumber, mortgage, or pledge for security the Property of the Company nor any Member's interest in the Company; nor shall Manager have authority to incur debt in the name or for the responsibility of the Company, directly or contingently...." Operating Agreement ¶ 6.01(f).

c.  The Manager must pay all property taxes and expenses associated with the Property and "shall cause the preparation and timely filing of all tax returns required to be filed by the Company…." *Id.* ¶¶ 6.02(b), (i), (l), 7.08.

d.  The Manager "shall maintain the [Property] and the furnishings therein in a first-class manner and direct, supervise and order to be done all things reasonably necessary for the proper maintenance, repair and replacement of properties." Management Authority ¶ 12.1.

e.  The Manager "shall obtain all necessary insurance for the [Property] and keep them in force by timely payments and by the filing and processing of claims arising from time to time." *Id.* ¶ 13.1.

f.  The Manager must separately account for and maintain the funds of the Company, Equity Owner Members, and Manager, and in doing so, "[t]he Company's funds may not be commingled with the funds of any Manager or Member." Operating Agreement ¶ 10.05.

g.  All of the Manager's duties and obligations under the Operating Agreement must be exercised consistent with the Manager's obligation of good faith and fair dealing, which cannot be waived. *See* C.R.S. § 7-80-108(2)(d).

**B.    Mr. Otero Agreed to Purchase Ten Membership Units in the Company Subject to the Terms and Conditions in the Offering Documents, Including that the Manager Transfer the Last Five Units to Him—*Free and Clear of All Liens and Encumbrances*"—Upon His Final Purchase Payment in late December 2020.**

25.    On or around December 24, 2019, Mr. Otero and the Manager executed a Subscription Agreement for his acquisition of seven membership units in the Company. A true and correct copy of this Subscription Agreement and the signature pages thereto is attached hereto as Exhibit C and incorporated herein by reference.

26.    In executing and agreeing to the Subscription Agreement, Mr. Otero and the Manager agreed and incorporated by reference therein to the terms and conditions of the Operating Agreement (Exhibit A) and the Management Authority (Exhibit B).

27.     The Manager and Mr. Otero also executed an Addendum to Membership Materials on or around December 24, 2019 (the "Addendum"). A true and correct copy of this Addendum and the signature pages thereto is attached hereto as Exhibit D and corporate herein by reference.

28.     Collectively, the Operating Agreement (Exhibit A), Management Authority (Exhibit B), Subscription Agreement (Exhibit C), and Addendum (Exhibit D) formed the "Offering Documents" that Mr. Otero and the Manager agreed to in connection with his initial acquisition of membership units in the Company on or around December 24, 2019.

29.     Under the Offering Documents, Mr. Otero agreed to purchase seven units in the Company for $810,000. *See* Ex. D (Addendum). Two of his seven units were to "transferred free and clear" to Mr. Otero "immediately" upon his payment of $330,000 by December 27, 2019. *Id.* Of this $330,000 payment, the parties agreed that $110,000 would "be considered a down payment on" Mr. Otero's remaining five units. *Id.* Mr. Otero agreed to fund the other $480,000 to complete his acquisition of the remaining five units "365 days" after his initial payment, subject to all "terms and conditions…presented in the…Offering Documents." *Id.*

30.     The "terms and conditions" in the Offering Documents that Mr. Otero's payment obligations are subject to include the Manager's agreement that Mr. Otero's five remaining units in the Company "shall be held by the seller as collateral until such time the full payment is made." *Id.* Another condition is that the Manager must issue the five units to Mr. Otero as "***fully paid and non-assessable free and clear of all liens and encumbrances of any kind***." Ex. C (Subscription Agreement ¶ 6) (emphasis added).

31.     In addition, Mr. Otero's agreement to pay for his five remaining units in the Company are subject to the terms and conditions described above regarding each Equity Owner

Member's obligation to pay quarterly shared expenses in accordance with the Operating Agreement and the Manager's obligation to promptly collect such expenses, the Manager's obligation not to encumber the Property or any Member's interests, the Manager's obligation not to incur debt for the Company, and the Manager's obligation to timely pay all taxes and expenses owed on the Property. His obligation to pay is also subject to the condition that the Manager transfer his units to him free and clear of all liens and encumbrances of any kind.

32.     Following execution of the Offering Documents, Mr. Otero paid $330,000 to the Manager and received his initial two units.

33.     In or around January 2020, Mr. Otero acquired three additional units in the Company for $306,000 that he paid to the Manager contemporaneous with his acquisition.

34.     Thus, Mr. Otero agreed to purchase a total of ten units in the Company, five of which he fully acquired and paid for by January 2020. The other five (the "Collateral Units"), as discussed, "shall be held by the seller as collateral" pending his final purchase payment and subject to the terms and conditions in the Offering Documents described above. Ex. D (Addendum).

35.     The Manager has represented to Mr. Otero that the "seller," who the Manager agreed "shall" hold the five Collateral Units as collateral, is Defendant Ligita Gidoomal Revocable Trust ("Gidoomal"). As an Equity Owner Member, Gidoomal agreed and is bound by the same terms and conditions in the Operating Agreement as Mr. Otero, including without limitation the obligation to timely and fully pay Quarterly Shared Expenses in accordance with Paragraph 5.03 of the Operating Agreement.

**C.     The Manager Has Breached and Continues to Breach Its Contractual and Fiduciary Obligations by Causing the Company to Incur Substantial Unpaid Debts and Taxes.**

36.     To date, Mr. Otero has fully performed his obligations under the Offering Documents and all other governing documents of the Company. Among other things, Mr. Otero has tendered or paid the initial capital contribution owed to date under the Offering Documents.

37.     Mr. Otero has also fully and timely paid his portion of the Quarterly Shared Expenses since becoming an Equity Owner Member. Indeed, in or around January 2020, Mr. Otero paid the Manager over $40,000 as full payment on his Shared Expenses for all of 2020 (referred to hereinafter as Mr. Otero's "2020 Shared Expense Payment").

38.     Although the Offering Documents only require Mr. Otero to pay Shared Expenses on a "quarterly" basis, Ex. A (Operating Agreement ¶ 5.03(a)), he pre-paid his entire year of Shared Expenses in or around January 2020, because the Manager represented to him that the other Equity Owner Members pre-paid their Shared Expenses in this manner as well.

39.     Nonetheless, Mr. Otero reasonably understood from the Offering Documents and his communications with the Manager that his 2020 Shared Expense Payment would be used to pay expenses incurred in 2020. Prior to his execution of the Offering Documents and pre-payment of Shared Expenses, the Manager never disclosed or suggested to Mr. Otero that his 2020 Shared Expenses Payment would be used to pay off past taxes, debts, and expenses incurred before Mr. Otero became an Equity Owner Member. Nor did the Manager disclose or suggest to Mr. Otero that the Company had outstanding debts incurred before he became an Equity Owner Member.

40.     But, in fact, Mr. Otero later discovered that the Manager caused the Company to incur significant unpaid debts and tax liability before he became an Equity Owner Member,

including a substantial unpaid balance that the Company owed to Timbers for past expenses and taxes owed for 2019.

41.     The Company incurred these unpaid debts and taxes, in large part, because the Manager failed or refused to collect Shared Expenses from most other Equity Owner Members, including Defendant Gidoomal (collectively, the "Defaulting Equity Owners").

42.     Rather than look to these Defaulting Equity Owners who were part of the Company and benefitted from these past expenses, the Manager used around $30,000 of Mr. Otero's 2020 Shared Expense Payment to pay down the outstanding balance owed to Timbers. Even though the Company still owed a significant balance to Timbers, the Manager pocketed the rest of the 2020 Shared Expense Payment for itself as a "management fee."

43.     Since Mr. Otero became an Equity Owner Member, the Manager has further plunged the Company into financial distress.

44.     For example, the Company owes tens of thousands in delinquent property taxes for fiscal years 2019 and 2020, including penalties and interest assessed and that continues to accrue.

45.     In addition, Timbers recently filed a Notice of Lien and Notice of Special Assessment Lien on the Property (the "Lien"), a true and correct copy of which is attached hereto as Exhibit E and incorporated herein by reference. This Lien is assessed at $141,983.43 owed to Timbers for unpaid expenses and fees through August 31, 2020. As of the date of this filing, the Company's unpaid debt owed to Timbers has only increased and continues to accrue.

46.     The Manager's failure to pay expenses and taxes has caused the Company to incur substantial debts in direct violation of the Operating Agreement. *See, e.g.*, Operating Agreement ¶ 6.01(f) (providing that Manager shall not "encumber, mortgage, or pledge for security the

Property of the Company nor any Member's interest in the Company; nor shall Manager have authority to incur debt in the name or for the responsibility of the Company, directly or contingently….").

47.     In addition, the Manager has continued to breach its obligations to collect Shared Expenses from the Defaulting Equity Owners, including Defendant Gidoomal, since Mr. Otero became an Equity Owner Member.

48.     Certain of these Defaulting Equity Owners are or have been directors or advisors to the Manager and/or its affiliates. The Manager's failure to collect Shared Expenses from such insiders—while holding Mr. Otero to his obligation to pay Shared Expenses—constitutes self-dealing by the Manager in further breach of its fiduciary duties.

**D.     Defendants are Unable or Unwilling to Transfer to Mr. Otero the Five Collateral Units Free and Clear of All Liens and Encumbrances.**

49.     On multiple occasions throughout 2020, Mr. Otero has sent written notice to the Manager demanding that the Manager pay the unpaid expenses and taxes owed by the Company and otherwise comply with the Manager's contractual and fiduciary duties. Mr. Otero has also provided written notice to the Manager that the Manager must clear any liens, unpaid debts, and delinquent taxes before he makes his final purchase payment of $480,000 pursuant to the Offering Documents.

50.     The Manager has failed or refused to comply with Mr. Otero's demands, or cure the deficiencies he has raised in communications to the Manager. The Manager has also stated clearly and unambiguously that it does not intend to clear all liens and encumbrances on the Property and Mr. Otero's Collateral Units prior to his final purchase payment.

51.     For example, on November 1, 2020, Mr. Otero emailed the Manager's representative, Rich Keith, stating that the Manager "need[s] to pay off any outstanding balance" and liens owed by the Company before he releases his final payment, or he would "have no other choice but to hold off [his] funds." On behalf of the Manager, Mr. Keith responded, "[a]s for paying the balances due Timbers et al, at the same time [as your final payment], that is not going to happen. We are working on that plan but it will not occur before you fund the $480,000."

52.     Also, as discussed, the Manager represented and agreed that the "seller" of Mr. Otero's five Collateral Units, Defendant Gidoomal, would hold those Units as collateral pending Mr. Otero's final purchase payment. However, while in custody of the Collateral Units, Gidoomal failed to pay any Shared Expenses in breach of Gidoomal's obligation to pay Shared Expenses pursuant to Paragraph 5.03 of the Operating Agreement.

53.     As a result of this failure to pay Shared Expenses, certain Equity Owner Members who complied with their obligations to pay Shared Expenses have brought a lawsuit against, among others, the Manager and Gidoomal styled *W2 Kauai, LLC et al. v. Lifestyle Asset Management, LLC et al.*, Civil No. 1:20-cv-01430-NRN, in the U.S. District Court for the District of Colorado. The plaintiffs in that lawsuit seek to redeem the Defaulting Equity Owners' membership units in the Company pursuant to Paragraph 5.03 of the Operating Agreement. They also allege equitable rights and interests in the Defaulting Equity Owners' units, including the five Collateral Units held by Gidoomal.

54.     Mr. Otero is ready, willing, and able to pay the final purchase payment of $480,000 pursuant to the Offering Documents to complete his acquisition of the Collateral Units. He further

tenders or offers to tender the $480,000 payment into the registry of the Court pending a transfer of the five Collateral Units to him free and clear of all liens and encumbrances of any kind, if ever.

55.     However, at present, Defendants have clearly and unequivocally repudiated and/or breached their obligations under the Offering Documents and Colorado law, including without limitation the obligations to pay and collect Shared Expenses, to not allow unpaid debts, liens, or taxes to accrue, and to transfer the Collateral Units to Mr. Otero "fully paid and non-assessable free and clear of all liens and encumbrances of any kind." Ex. C (Subscription Agreement ¶ 6) (emphasis added).

56.     The Manager's foregoing acts and omissions have deprived Mr. Otero of his rights under the Offering Documents and Colorado law. Moreover, the Manager has endangered the Company and Mr. Otero's interests therein by, among other things, failing to collect amounts expressly and unambiguously owed to the Company by the Defaulting Equity Owners, encumbering the Property and Collateral Units with substantial debts and unpaid taxes, and damaging the Company's relationship and reputation with Timbers.

## CAUSES OF ACTION

### Count I: Breach of Contract (Against the Manager)

57.     Plaintiff incorporates by reference the allegations set forth in all preceding and below paragraphs as if fully set forth herein.

58.     Plaintiff and the Manager entered into valid and enforceable contracts, including the Offering Documents, the Operating Agreement, the Management Authority, the Subscription Agreement, and the Addendum.

59.     To date, Plaintiff has fully and/or substantially performed his obligations under these agreements with the Manager, as further described in paragraphs above.

60.     Mr. Otero is also ready, willing, and able to make the final purchase payment under the Offering Documents. He further tenders or offers to tender the $480,000 payment into the registry of the Court subject to resolution, if ever, of the Manager's prior material breaches and/or anticipatory repudiation of its obligations under the Offering Documents, including its obligation clear of all liens and encumbrances of any kind on the Property, the Company, and the Collateral Units before transferring the same to Mr. Otero.

61.     The Manager has breached and/or repudiated its obligations under its agreements with Plaintiff. As further described above, the Manager's breaches include without limitation failing to collect the Quarterly Shared Expenses from the Defaulting Equity Owners; failing to timely pay expenses and taxes on the Property; allowing unpaid debts and taxes to accrue on the Property; and failing or refusing to clear all liens and encumbrances on the Property, Company, and Collateral Units to be transferred to Mr. Otero.

62.     As a proximate result of the foregoing breaches, Plaintiff has suffered and continue to suffer damages in an amount to be determined at trial. In addition to recover of such damages, Plaintiff seeks declaratory relief, specific performance of the Manager's obligations outlined herein, reasonable and necessary attorney's fees, and all other equitable relief to which Plaintiff may be entitled.

### Count II: Breach of Good Faith and Fair Dealing (Against the Manager)

63.     Plaintiff incorporates by reference the allegations set forth in all preceding and below paragraphs as if fully set forth herein.

64.     Plaintiff and the Manager entered into valid and enforceable contracts, including the Offering Documents, the Operating Agreement, the Management Authority, the Subscription Agreement, and the Addendum.

65.     Under Colorado law, the Manager owes Plaintiff a contractual duty of good faith and fair dealing in discharges its contractual obligations under the parties' contracts.

66.     To date, Plaintiff has fully and/or substantially performed his obligations under these agreements with the Manager, as further described in paragraphs above.

67.     Mr. Otero is also ready, willing, and able to make the final purchase payment under the Offering Documents. He further tenders or offers to tender the $480,000 payment into the registry of the Court subject to resolution, if ever, of the Manager's prior material breaches and/or anticipatory repudiation of its obligations under the Offering Documents, including its obligation clear of all liens and encumbrances of any kind on the Property, the Company, and the Collateral Units before transferring the same to Mr. Otero.

68.     The Manager has breached and/or repudiated its contractual duties of good faith and fair dealing owed to Plaintiff. As further described above, the Manager's breaches include without limitation failing to collect the Quarterly Shared Expenses from the Defaulting Equity Owners; failing to timely pay expenses and taxes on the Property; allowing unpaid debts and taxes to accrue on the Property; and failing or refusing to clear all liens and encumbrances on the Property, Company, and Collateral Units to be transferred to Mr. Otero.

69.     As a proximate result of the foregoing breaches, Plaintiff has suffered and continue to suffer damages in an amount to be determined at trial. In addition to recover of such damages, Plaintiff seeks declaratory relief, specific performance of the Manager's obligations outlined

herein, reasonable and necessary attorney's fees, and all other equitable relief to which Plaintiff may be entitled.

## Count III: Breach of Contract (Against Gidoomal)

70.     Plaintiff incorporates by reference the allegations set forth in all preceding and below paragraphs as if fully set forth herein.

71.     Plaintiff and Defendant Gidoomal entered into and agreed to be bound by the terms of the Operating Agreement, which is a valid and enforceable contract.  In addition, Plaintiff and the Manager acting on behalf or for the benefit of Gidoomal entered into the Subscription Agreement and Addendum regarding Plaintiff's purchase of membership units held by Gidoomal.

72.     To date, Plaintiff has fully and/or substantially performed his obligations under these agreements with Gidoomal, as further described in paragraphs above.

73.     Mr. Otero is also ready, willing, and able to make the final purchase payment under the Offering Documents. He further tenders or offers to tender the $480,000 payment into the registry of the Court subject to resolution, if ever, of Gidoomal's prior material breaches and/or anticipatory repudiation of Gidoomal's obligations under the Offering Documents, including the obligation to pay Shared Expenses owed in connection with the Collateral Units prior to the transfer of the Units to Mr. Otero.

74.     Gidoomal has breached and/or repudiated Gidoomal's obligations under the Operating Agreement and Offering Documents. As further described above, Gidoomal's breaches includes failure to pay Quarterly Shared Expenses owed under Paragraph 5.03 of the Operating Agreement on the Collateral Units, and failure to hold the Collateral Units as collateral pending Mr. Otero's final purchase payment.

75.     As a proximate result of the foregoing breaches, Plaintiff has suffered and continue to suffer damages in an amount to be determined at trial. In addition to recover of such damages, Plaintiff seeks declaratory relief, specific performance of Gidoomal's obligations outlined herein, reasonable and necessary attorney's fees, and all other equitable relief to which Plaintiff may be entitled.

### Count IV: Breach of Fiduciary Duty (Against the Manager)

76.     Plaintiff incorporates by reference the allegations set forth in all preceding and below paragraphs as if fully set forth herein.

77.     A fiduciary relationship exists and has existed between Plaintiff and the Manager at all relevant times in this case, including throughout the duration of the Manager's wrongful conduct at issue. That fiduciary relationship imposes on the Manager a number of fiduciary duties that it owes to Plaintiff and the Company, including without limitation the duty of care, the duties to act competently and diligently in relation to the Company's business, the duty of loyalty, and the duty to refrain from self-dealing and competition with the Company.

78.     The Manager has breached and continues to breach its fiduciary duties owed to Plaintiff and the Company. As further described above, the Manager's breaches include without limitation failing to collect the Quarterly Shared Expenses from the Defaulting Equity Owners; failing to require "insider" Defaulting Equity Owners to pay Shared Expenses, while holding Plaintiff to his obligations to pay under the Offering Documents; failing to timely pay expenses and taxes on the Property; allowing unpaid debts and taxes to accrue on the Property; and failing or refusing to clear all liens and encumbrances on the Property, Company, and Collateral Units to be transferred to Mr. Otero.

79.     As a proximate result of the foregoing breaches, Plaintiff has suffered and continue to suffer damages in an amount to be determined at trial. In addition to recover of such damages, Plaintiff seeks declaratory relief, specific performance of the Manager's obligations outlined herein, reasonable and necessary attorney's fees, and all other equitable relief to which Plaintiff may be entitled.

**Count V: Declaratory Judgment (Against Both Defendants)**

80.     Plaintiff incorporates by reference the allegations set forth in all preceding and below paragraphs as if fully set forth herein.

81.     Plaintiff has alleged actual controversies between himself, the Manager, and Defendant Gidoomal regarding their respective rights and obligations under the Offering Documents.

82.     Plaintiff requests a judicial declaration, under 28 U.S.C. § 2201 that the parties have the following rights and obligations under the Offering Documents and/or Colorado law:

    a.   Plaintiff has no obligation to pay, and is not in breach of the Offering Documents for not paying, the $480,000 final purchase payment referenced in the Addendum, unless and until all liens and encumbrances of any kind on the Property and the Collateral Units are paid, cleared, and/or removed.

    b.   The Manager or Gidoomal must pay all Shared Expenses owed under Paragraph 5.03 of the Operating Agreement on each of the Collateral Units before the transfer of the Collateral Units to Plaintiff.

83.     This Court may declare the rights and other legal relations of any interested party seeking declaratory judgment, whether or not further relief is or could be sought. Any such

declaration shall have the force and effect of final judgment or decree. 28 U.S.C. § 2201(a). Plaintiff requests a judicial decree as detailed in the foregoing paragraph. Plaintiff further requests his reasonable attorney's fees incurred in pursuing this action.

## CONDITIONS PRECEDENT

84.     All conditions precedent to Plaintiff's claims for relief have been performed, have occurred, or are excused or waived.

## JURY DEMAND

85.     Plaintiff hereby demands a trial by jury on any contested issues of material fact. Plaintiff tenders the requisite jury fee to the Clerk of the Court.

## PRAYER FOR RELIEF

Plaintiff prays for judgment from this Court as follows:

a.      actual, consequential, expectation, and/or restitution damages;

b.      declaratory relief as detailed above;

c.      specific performance of Defendants' obligations under the applicable contracts as outlined above and herein;

d.      any other equitable relief, including without limitation rescission (in whole or in part), estoppel, and disgorgement of profits, that Plaintiff shows himself to be entitled to;

e.      reasonable and necessary attorneys' fees and costs;

f.      pre- and post-judgment interest; and

g.      all other relief that this Court finds just or equitable.

DATED: December 22, 2020

Respectfully submitted,

*/s/ Edward Jason Dennis*
Edward Jason Dennis
Texas Bar No. 24045776
jdennis@lynnllp.com
Patrick Disbennett
Texas Bar No. 24094629
pdisbennett@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3837 – Direct
214-981-3839 – Fax

***Counsel for Plaintiff***